Filed 12/9/25  P. v. Santillan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CEASAR ANTHONY SANTILLAN,<br><br>  Defendant and Appellant. | G063576<br><br>(Super. Ct. No. FVI020950)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of San Bernardino County, Debra Harris, Judge. Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

Ceasar Anthony Santillan appeals from a postjudgment order denying his petition for resentencing after an evidentiary hearing under Penal Code section 1172.6 (all undesignated statutory references are to this code). Santillan argues he was not guilty of first degree murder under current law. He asserts insufficient evidence supports the trial court's finding he was a major participant in the underlying felonies who acted with reckless indifference to human life. He also contends insufficient evidence supports the court's finding he acted with an intent to kill.

We affirm. We conclude substantial evidence supports the trial court's finding Santillan was a major participant in the underlying felonies who acted with reckless indifference to human life. Because Santillan was guilty of first degree murder under this theory, we need not consider his argument regarding intent to kill.

FACTUAL BACKGROUND[1]

"Three persons were involved in the crimes: [Francisco] Nunez, Santillan, and the latter's girlfriend Alysha Reyez. Before trial Reyez pleaded guilty to voluntary manslaughter and the use of a firearm; she was sentenced to 15 years. She testified for the prosecution." (*People v. Nunez* (Aug. 25, 2014, G049908) [nonpub. opn.].)

I.

PROSECUTION'S EVIDENCE

Santillan and Reyez started dating a few months before the murder. They used and sold methamphetamine together.

_____

[1] Unless otherwise noted, the facts are taken from the original trial transcripts.

2

In September 2004, Reyez and Santillan visited Nunez to collect money. Nunez owed Reyez roughly $200. Nunez told Reyez he did not have the money but he would rob someone. Reyez agreed. Nunez entered Santillan's car and sat in the backseat behind the driver, Santillan. Nunez saw a shotgun by Reyez's leg in the front passenger seat and asked if she had anything smaller. Reyez replied yes, a handgun. She inserted a clip into the handgun and passed it back to Nunez. Santillan began to drive around Victorville looking for someone to rob.

They stopped at a liquor store where Reyez bought cigarettes. When she returned to the car, she heard Santillan and Nunez speaking Spanish, a language she did not understand. Nunez then said to follow the truck that was parked next to Santillan's car. Santillan followed the truck to a parking lot across the street. After Santillan parked, Nunez exited the car and put the handgun to Armando Naranjo, who was standing outside his truck. Nunez brought Naranjo to the car. Santillan and Nunez again spoke in Spanish. One of them instructed Reyez to sit in the backseat and when she did, Nunez put Naranjo in the front passenger seat. Santillan handed the shotgun to Reyez, who pointed it at Naranjo. Nunez told them to follow him and started driving Naranjo's truck.

Santillan followed Nunez to a gas station. He and Reyez met Nunez and picked up food at a restaurant next door. Afterward, Nunez said to follow him again, which Santillan did.

They all eventually stopped. Santillan and Reyez walked Naranjo to the truck. Santillan and Nunez spoke in Spanish. Reyez and Nunez next began to search Naranjo for money and found approximately $200. Nunez directed Naranjo to get into the truck bed, covered it with a hardtop, and

3

locked it. Santillan and Nunez spoke in Spanish again, and Santillan told Reyez they were going to follow Nunez.

Nunez drove the truck for a few hours, with Santillan following behind in the car. They ended up at a remote location. Nunez exited the truck and came to the car, where he asked Reyez for the shotgun. She handed Nunez the shotgun, and he gave her the handgun. Nunez walked back to the truck and let Naranjo out of the truck bed. Naranjo immediately ran and Nunez chased him.

Santillan and Reyez exited the car and walked to the truck. Reyez heard a couple of gunshots. She saw Naranjo fall as if he had been shot in the leg, stand up, and start running again. She heard a couple of more gunshots. Nunez had shot and killed Naranjo.

Santillan instructed Reyez to drive the car to Nunez and said he would drive the truck. After they stopped near Nunez, Nunez got into the truck with Santillan, and Reyez followed them to a park. At the park, Nunez went inside the car with Reyez. Santillan instructed Reyez to follow him to his friend S.C.'s house in Rialto.

Santillan parked the truck in S.C.'s driveway. Santillan and Reyez placed a cover over the truck and brought the guns inside the house. Reyez put the shotgun behind S.C.'s bedroom door and Santillan put the handgun in the closet.

Santillan, Reyez, and Nunez left S.C.'s house that night. Santillan drove the truck while Reyez drove the car. After dropping off Nunez, Reyez followed Santillan who parked the truck in "kind of a secluded area." Thereafter, Santillan and Reyez went to her mother's house.

The next day, Santillan and Reyez picked up the truck and discussed "getting rid of the truck and taking the rims off." Santillan drove

4

the truck to El Monte, where his friend C.Z., a "backyard mechanic" lived. Reyez followed him in the car. Santillan told C.Z. he was considering buying the truck and wanted her to inspect it. C.Z. told him to leave the truck and she would look at it later. At C.Z.'s house, Santillan and Reyez removed the rims, the stereo system, the wiring, and the battery. They loaded these items into the car, left the truck, and drove back in the car to S.C.'s house. Even though Santillan told C.Z.'s brother he would return to pick up the truck, Santillan never did.

When Santillan and Reyez arrived at S.C.'s house, they took the rims inside as Santillan wanted to take photographs of the shotgun together with the rims and his marijuana plant; Reyez took the photographs.

That night, Reyez told Santillan she wanted "to get rid of the shotgun." Santillan said he knew a potential buyer. The next morning, he took her to his friend B.B. and Reyez testified she sold the shotgun to B.B. As part of a separate investigation, the police recovered the shotgun from B.B. and, at that time, B.B. told the police that Santillan gave him the shotgun to hold. At trial, B.B. testified that Santillan sold the shotgun for Reyez.

A few weeks after the murder, Santillan was taken into custody for absconding from parole and he started writing letters to Reyez. In one letter, Santillan wrote, "'Don't forget to clean up Shady's mess ASAP.'" Santillan and Reyez had nicknamed the shotgun "Shady" and the handgun "Smalls." Reyez interpreted Santillan's letter to mean "to clean up the bullet shells if the body was still there." In other letters, Santillan notified Reyez he found a potential buyer for the rims. He wrote about his jealousy of her ex-boyfriend and said, "'I could be pretty crazy at times, and I don't want to get that way ever again, . . . Shady and all.'" Reyez interpreted that to mean "something similar could happen again." He also warned her they needed "to

be careful right now," after some detectives visited him and asked about the truck.

In December 2004, Reyez contacted the San Bernardino County Sherrif's Department and showed deputies where the murder occurred. A search and rescue team searched the area and found Naranjo's body.

That same month, Mitchell Dattilo, a detective at the time, interviewed S.C. During the interview, S.C. told Dattilo he had conversations with Santillan around the time Santillan and Reyez brought the rims to S.C.'s house. At trial, S.C. testified he could not remember these conversations with Santillan, but after listening to a tape recording of the interview the morning of his testimony, he acknowledged he made certain statements to Dattilo. S.C. testified he was under the influence of drugs at the time of the interview.

Dattilo testified that, when S.C. spoke with Santillan, Santillan told S.C. the following. A "guy died over that truck." Santillan was disappointed he did not do more to stop what had happened. He knew if he had let Naranjo go or stopped the shooting, something could have happened to him. Santillan said, at one point, "[G]o ahead and kill this mother fucker." Naranjo ran away, and Santillan "heard a loud boom." Naranjo fell down and was shot again. Santillan said no one would find Naranjo's body.

## II.

### DEFENSE EVIDENCE

Santillan testified in his own defense. He denied killing, carjacking, robbing, or kidnapping anyone. His account was the following.

In September 2004, Reyez broke into a house, where her brother and his roommate lived, and stole several weapons, including a shotgun. Reyez wanted to sell the guns. Santillan went to his friend's house and tried

6

to sell them to him. His friend was not interested but called Nunez. Nunez bought a couple of weapons, but not the shotgun or handgun. Nunez also bought some drugs from Reyez. Because he did not have enough money for the drugs, he said he would pay her back.

One day, Reyez called Santillan sounding scared. She said she had a stolen truck. Santillan told her to meet him at a store where he saw her and Nunez with a "very nice" truck. Reyez told Santillan "someone had died over the truck." Santillan told her to follow him to S.C.'s house. He wanted to help Reyez because of greed and because she was helping him while he was on the run from parole.

They parked the truck at S.C.'s house. Santillan put a cover over the truck. When S.C. returned home, Santillan told S.C. the truck was stolen and Santillan would "find out more about the truck." Santillan asked Reyez what had happened. She told him "someone was jacked over the truck."

Santillan looked in the truck, saw guns, and took them inside the house. When Santillan later drove his car to take Nunez home, Nunez told Reyez she "was paid in full." After dropping off Nunez, Santillan and Reyez went to her mother's house. The truck was left behind at S.C.'s house overnight.

The next morning, Santillan and Reyez returned to S.C.'s house for the truck. They removed the stereo equipment from the truck. Reyez sold the radio to a friend, and they left most of the equipment at S.C.'s house. Santillan then "wanted to get rid of the truck" and he drove it to C.Z.'s house with Reyez trailing him in the car. Santillan told C.Z. the truck was stolen and that she could have it, except for the tires and rims. Santillan and Reyez removed the tires and rims, and took them back to S.C.'s house. Santillan took photographs of the rims to advertise them for sale but was unsuccessful.

Santillan helped Reyez sell the shotgun. He wanted to help because of his own greed and because he wanted "to keep her out of trouble." He took Reyez to B.B.'s house, and Reyez and B.B. negotiated a sale.

In October 2004, Santillan was taken into custody. He wrote letters to Reyez, including one in which he instructed her "to clean up Shady's mess" because detectives had visited him. That message meant he wanted "her to get rid of the . . . rims" and any other items that came from the truck. He knew the shotgun was the murder weapon because Reyez had told him.

## PROCEDURAL HISTORY

In 2011, a jury found Santillan guilty of first degree murder (§ 187; count 1), carjacking (§ 215; count 2), robbery (§ 211; count 3), kidnapping during a carjacking (§ 209.5; count 4), kidnapping to commit robbery (§ 209, subd. (b)(1); count 5), and felony possession of a firearm (§ 12021, subd. (a)(1); count 7). As to count 1, the jury found true the allegation that a principal was armed with a firearm (§ 12022, subd. (a)), and it found true the following special circumstance allegations: murder in the course of robbery (§ 190.2, subd. (a)(17)(A)), murder in the course of carjacking (§ 190.2, subd. (a)(17)(L)), murder in the course of kidnapping to commit robbery (§ 190.2, subd. (a)(17)(B)), and murder in the course of kidnapping during a carjacking in violation of section 209.5 (§ 190.2, subd. (a)(17)(B)). On counts 2 through 5, the jury found true a principal was armed with a firearm (§ 12022, subd. (a)), but found not true the remaining special allegations. The trial court sentenced Santillan to life without the possibility of parole plus 13 years.

8

On appeal, a panel of this court reversed the conviction for carjacking, but affirmed the judgment in all other respects. (*People v. Nunez, supra*, G049908.)

In 2021, Santillan filed a petition for resentencing under former section 1170.95 (now § 1172.6). After briefing by the parties, the trial court found Santillan made a prima facie showing of entitlement to relief and issued an order to show cause.

At the evidentiary hearing, the trial court considered documents from the record of conviction, including the trial transcript and exhibits. In a written ruling, the court denied the petition, finding beyond a reasonable doubt Santillan was guilty of first degree murder under current law. It found Santillan acted with the intent to kill and was a major participant in the underlying felonies who acted with reckless indifference to human life.

Santillan timely appealed.

DISCUSSION

I.

SECTION 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015) "significantly narrowed the scope of the felony-murder rule." (*People v. Emanuel* (2025) 17 Cal.5th 867, 875 (*Emanuel*).) "A felony-murder conviction may no longer rest on the mere commission of and intent to commit an underlying felony. If a defendant was not the actual killer or an aider and abettor acting with intent to kill, the statute now requires that the defendant be a major participant in the felony who acted with reckless indifference to human life. [Citation.] With the enactment of Senate Bill No. 1437, the Legislature also created a vehicle for defendants previously convicted of

9

murder under the broader and now invalidated felony-murder rule to petition for resentencing." (*Ibid.*, fn. omitted.)

The process begins when a defendant previously convicted of a qualifying offense files a petition pursuant to section 1172.6, subdivision (b). If the petitioner makes a prima facie showing of entitlement to relief, the court must issue an order to show cause. (*Ibid.*)

At the order to show cause hearing, the prosecution bears the burden of proving beyond a reasonable doubt the petitioner is guilty of murder or attempted murder under the amended law. (§ 1172.6, subd. (d)(3).) Both parties may present "new or additional evidence to meet their respective burdens." (*Ibid.*) "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid.*) If the court finds beyond a reasonable doubt the petitioner is guilty of murder or attempted murder under a theory that remains valid after the amendments to sections 188 and 189, the petition is denied. (*Ibid.*) However, "[i]f the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

II.

LEGAL PRINCIPLES: MAJOR PARTICIPANT AND RECKLESS INDIFFERENCE

"[T]he major participant and reckless indifference concepts trace their origin to a pair of United States Supreme Court decisions—*Enmund v. Florida* (1982) 458 U.S. 782 . . . and *Tison v. Arizona* (1987) 481 U.S. 137. . . —that articulate the constitutional limits of capital punishment for accomplices to felony murder. [Citation.] In *Enmund*, the high court held that

a minor participant in an armed robbery (the getaway driver), who neither intended to kill nor had any other culpable mental state, was ineligible for the death penalty. [Citations.] A few years later, the high court revisited the issue in *Tison*, considering the case of defendants who broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the remote desert after the escapees shot them. [Citation.] The court held that 'major participation in the felony committed, combined with reckless indifference to human life,' provides a sufficient degree of culpability to be eligible for a sentence of death. [Citation.] Section 190.2, subdivision (d), added by voter initiative in 1990 [citation] was designed to codify the holding of *Tison* and, by extension, the related holding of *Enmund*. [Citation.] Section 190.2, subdivision (d), by its text, imposes an actus reus requirement, i.e., major participation in the enumerated felony, and a mens rea requirement, i.e., reckless indifference to human life." (*Emanuel, supra*, 17 Cal.5th at p. 882.)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court "endeavored to elucidate the contours of the major participant and reckless indifference standards" (*Emanuel, supra*, 17 Cal.5th at p. 882): "*Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life, while *Clark* further refined the reckless indifference inquiry." (*People v. Strong* (2022) 13 Cal.5th 698, 706–707.) Our Supreme Court has emphasized the determination of whether a defendant was a major participant who acted with reckless indifference to human life is "a fact-intensive, individualized inquiry." (*In re Scoggins* (2020) 9 Cal.5th 667, 683 (*Scoggins*).)

In *Banks*, the California Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks, supra*, 61 Cal.4th at p. 794.) It identified a series of factors to help guide this inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) The California Supreme Court explained: "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid.*)

*Banks* "observed that *Enmund* and *Tison* 'collectively place conduct on a spectrum' of culpability, 'with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions.'" (*Emanuel, supra*, 17 Cal.5th at p. 882.) *Banks* "cautioned that, though the conduct of the defendants in *Enmund* and *Tison* mark opposite ends of the spectrum for 'nonkiller felony murderers,' *Enmund*'s actions do not represent 'the outer limit of conduct immune from death eligibility,' any more than the Tisons' actions represent the 'constitutional minimum level of culpability for death eligibility.'" (*Emanuel*, at pp. 882–883.)

12

The following year, in *Clark*, the California Supreme Court, focused its analysis on the element of reckless indifference to human life and reiterated: "'reckless indifference,' . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Our Supreme Court explained reckless indifference has "both subjective and objective elements." (*Ibid.*) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Scoggins, supra,* 9 Cal.5th at p. 677.) Nor can reckless indifference to human life be established by "knowing participation in an armed robbery, standing alone." (*People v. Strong, supra*, 13 Cal.5th at p. 706.)

"'The degree of risk to human life is crucial to the analysis.' [Citation.] As the United States Supreme Court has acknowledged, "'the possibility of bloodshed is inherent in the commission of any violent felony,"' such that one who perpetrates or attempts to perpetrate such a crime may

13

well anticipate 'the use of lethal force as a *possibility*.'" (*Emanuel, supra,* 17 Cal.5th at p. 884.)

In *Clark*, the California Supreme Court considered a series of factors relevant to the determination of whether the defendant acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at pp. 618–622.) These factors are: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677.) The *Clark* court indicated, like the factors identified in connection with the major participant inquiry in *Banks*, no single factor is necessary [or] "'necessarily sufficient.'" (*Clark, supra*, 63 Cal.4th at p. 618.) "We analyze the totality of the circumstances to determine whether" the defendant "acted with reckless indifference to human life." (*Scoggins,* at p. 677.)

Recently, in *Emanuel*, our Supreme Court applied and clarified some of the *Clark* factors in reviewing a section 1172.6 petition. (*Emanuel, supra*, 17 Cal.5th at pp. 885–896; see also *In re Moore* (2021) 68 Cal.App.5th 434, 449–450) [discussing *Scoggins*'s clarification of "some of the *Clark* factors"].) For example, *Emanuel* emphasized, when a court considers whether a defendant was a restraining influence on the defendant's cohorts, "[t]he focus should not be on the ultimate *efficacy* of [the defendant's] actions, but on what his actions reveal about his mental state." (*Emanuel,* at p. 891.)

14

## III.

### SUBSTANTIAL EVIDENCE SUPPORTS SANTILLAN WAS A MAJOR PARTICIPANT WHO ACTED WITH RECKLESS INDIFFERENCE TO HUMAN LIFE

We next apply these principles to the facts of this case. We review the denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence. (*Emanuel, supra,* 17 Cal.5th p. 885.) "Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

"Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) ""If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" [Citation.] It is well settled that '"[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the [trier of fact's finding]."""" (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233–234.)

*A. Santillan Was a Major Participant in the Underlying Felonies*

### 1. Planning the Criminal Enterprise

While Nunez appeared to have a primary role, Santillan played a significant role "in planning the criminal enterprise that led to" Naranjo's death. (*Banks, supra*, 61 Cal.4th at p. 803.) Nunez proposed the plan of committing a robbery. By his actions, Santillan agreed to the plan and carried it out: he drove Reyez and Nunez around in his car to find someone to rob.

Then, at several junctures in the subsequent course of events, Santillan's actions demonstrated he participated in the planning: Santillan and Nunez frequently conferred, Nunez or Santillan informed Reyez what the next steps would be, and everyone acted according to the plan. Outside the liquor store, after speaking with Santillan, Nunez announced the plan to follow Naranjo's truck, and Santillan followed the truck in his car. After the taking of the truck, Santillan and Nunez conferred again. Thereafter, Nunez placed Naranjo in the car, Santillan handed the shotgun to Reyez to point at Naranjo in the car, Nunez told them to follow him in the truck, and Santillan followed Nunez. When Nunez stopped and put Naranjo in the truck bed, Santillan and Nunez conferred, and Santillan then informed Reyez they were going to follow Nunez. When they arrived at the remote location, Reyez gave the shotgun, which Santillan transported in his car, to Nunez, who used it to kill Naranjo.

### 2. Supplying or Using Lethal Weapons

Santillan participated "in supplying or using lethal weapons." (*Banks, supra*, 61 Cal.4th at p. 803.) He did not hand the shotgun to Nunez before Nunez shot and killed Naranjo. Reyez did. But Santillan gave the

shotgun to Reyez to point at Naranjo in the car and it was Santillan who transported the shotgun in his car to the murder scene.

3. Santillan's Awareness of Particular Dangers

Santillan was aware of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants." (*Banks, supra*, 61 Cal.4th at p. 803.) At the relevant times here, Santillan was on the run from parole. He had prior felony convictions for robbery and receiving stolen property. He and Reyez had both a shotgun and handgun in Santillan's vehicle at the time they met up with Nunez. Santillan also knew Nunez and Reyez had engaged in drug transactions.

The evidence shows Santillan was aware of the dangers presented by the crimes. He coordinated with Nunez to rob and kidnap Naranjo. After Nunez locked Naranjo in the truck bed, Santillan followed Nunez for a few hours to a *remote* location, and each of them had guns in their vehicles. At that point, the purpose of the trip was clear: they had gone to this remote location to kill Naranjo. The shooting here was not spontaneous.

4. Presence at the Scene of the Killing

Santillan was "present at the scene of the killing, in a position to facilitate or prevent the actual murder" and his "own actions or inaction play[ed] a particular role in the death." (*Banks, supra*, 61 Cal.4th at p. 803.) At no point did Santillan resist the criminal plan. At every step he participated in the underlying crimes leading to murder. After the taking of the truck, Santillan had Naranjo in his car, along with Reyez. At that point, Santillan had an opportunity to release Naranjo but did not. After they took Naranjo's money, approximately the same amount Nunez owed Reyez, Santillan continued to follow Nunez rather than leave.

17

While following Nunez for a few hours, Santillan had opportunities to veer away and abandon Nunez. Instead, once they all arrived at the remote area, Nunez approached Santillan's car and asked for the shotgun, which Santillan transported and which Reyez handed to Nunez. According to S.C., Santillan encouraged the killing at some point, saying, "[G]o ahead and kill this mother fucker." S.C. also testified Santillan believed he could have stopped the killing.

Santillan asserts he made the statement, "[G]o ahead and kill this mother fucker" while expressing his frustration to S.C. over his failure to stop the killing. But, based on the trial transcript, the statement was not made in that context. Rather, Santillan made the statement while describing what had happened on the day of the murder.

5. Santillan's Actions After the Killing

Most telling were Santillan's actions "after lethal force was used." (*Banks, supra*, 61 Cal.4th at p. 803.) He tried to cover up the murder. After the killing, he directed Reyez to drive the car to Nunez and stated he would follow in the truck. Santillan picked up Nunez and drove away from the murder scene. Reyez followed them to a park, where Nunez joined Reyez in the car and Santillan directed Reyez to follow him to S.C.'s house.

Santillan's next steps were to hide and dispose of the truck and to get rid of the murder weapon. Santillan and Reyez put a cover over the truck at S.C.'s house, and Santillan later parked the truck in a secluded area that night. The next morning, Santillan abandoned the truck at C.Z.'s house after removing the rims and other parts from the truck. He also set up the sale of the shotgun to B.B. After Santillan was taken into custody, he wrote letters to Reyez, instructing her to "to clean up Shady's mess ASAP"—i.e., to

18

eliminate any evidence tying the shotgun to the murder—and informing her of a potential buyer for the rims.

In sum, contrary to Santillan's assertions, he was not "mostly a taxi driver" and not "a relatively 'minor actor.'" Each of the factors weigh in favor of a major participant finding. Substantial evidence supports the trial court's finding Santillan was a major participant in the underlying felonies. As the court found, "[Santillan] participated in the planning of the robbery and was an integral part of the robbery team. He facilitated the robbery by using his vehicle to drive the robbery team, and later drove his vehicle to kidnap the victim. [Santillan] saw the events, heard the shots, and drove Nunez away from the scene, leaving the victim for dead. [Santillan] then directed the disposition of the property, even after his arrest."

*B. Santillan Acted with Reckless Indifference to Human Life*

The major participant and reckless indifference requirements generally have significant overlap, "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark, supra*, 63 Cal.4th at p. 615.) We analyzed several of the *Clark* factors in our major participant discussion *ante*, including: whether Santillan used or knew a gun would be used during the felony, the number of weapons used, whether Santillan was "physically

present at the crime,"[2] "the opportunity to restrain the crime or aid the victim," Santillan's knowledge of his "confederate's propensity for violence or likelihood of using lethal force," and whether Santillan made efforts "to minimize the risks of violence during the felony." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

We therefore turn our attention to the remaining *Clark* factor, "the duration of the interaction between the perpetrators of the felony and the victims." (*Scoggins, supra*, 9 Cal.5th at p. 677.) "Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. The Tisons, the high court noted, 'guarded the victims at gunpoint while [the group of perpetrators] considered what next to do.' [Citation.] Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620, fn. omitted.) Here, Santillan willingly gave Reyez the shotgun to hold Naranjo at gunpoint in the car for a

---

[2] "Proximity to the murder and the events leading up to it may be particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark, supra*, 63 Cal.4th at p. 619.) We elaborate on *Clark*'s presence factor to emphasize Santillan's actions showed he shared in the actions and mental state of Nunez. Over the course of several hours and at many points before the killing, Santillan was present, participated the underlying felonies, and failed to act as a restraining influence, as we discussed *ante*.

20

period time, even stopping to pick up food at one point. After they eventually stopped and exited the car, Santillan watched Reyez and Nunez search Naranjo for money and saw Nunez put Naranjo in the truck bed. Santillan and Nunez talked, and Santillan informed Reyez they would follow Nunez. Such actions suggest Santillan and Nunez discussed what to do next. Subsequently, Santillan drove his car and followed Nunez and Naranjo for a few hours, presenting "'a greater window of opportunity for violence'" (*Clark, supra*, 63 Cal.4th at p. 620), until Nunez killed Naranjo. The duration of the interaction between Santillan and Naranjo was protracted and violent in nature, implying Santillan acted with reckless indifference to Naranjo's life.

In sum, each of the *Clark* factors weigh in favor of a reckless indifference finding. Santillan transported guns in his car during the commission of the crimes, including the murder weapon, over the course of several hours. He handed the shotgun to Reyez in the car, who held Naranjo at gunpoint. Santillan had many opportunities to restrain the crimes, aid Naranjo before the killing, and minimize the risks of violence, especially given the prolonged duration of time. Instead, over the course of the events, Santillan had several conversations with Nunez and, after each of those conversations, he willingly chose to continue to engage in the underlying crimes and ultimately ended up being present at the murder scene. "[T]he murder [was] a culmination or a foreseeable result of several intermediate steps." (*Clark, supra*, 63 Cal.4th at p. 619.) The evidence shows, at the latest, by the time Santillan was following Nunez for a few hours to a remote location, Santillan knew why they were driving there: to kill Naranjo. These actions showed Santillan was aware of and willingly involved in the underlying crimes and had no regard of the significant risk of death his actions created. This disregard involved ""a gross deviation from the

21

standard of conduct that a law-abiding person would observe in the actor's situation.'"'" (*Scoggins, supra,* 9 Cal.5th at p. 677.)

## DISPOSITION

The postjudgment order is affirmed.


                                        MOTOIKE, ACTING P. J.

WE CONCUR:


MOORE, J.


SCOTT, J.